# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| NHU TRAN, Individually and on Behalf of All Others Similarly Situated, ) ) ) | |
| Plaintiff, ) ) | Case No. |
| v. ) ) | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934** |
| CEMPRA, INC., GARHENG KONG, DAVID ZACCARDELLI, MICHAEL R. DOUGHERTY, DAVID GILL, DOV A. GOLDSTEIN, JOHN H. JOHNSON, RICHARD KENT, and P. SHERRILL NEFF, ) ) ) ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. ) ) ) | |

Plaintiff Nhu Tran ("Plaintiff"), by and through his undersigned attorneys, brings this stockholder class action on behalf of himself and all other similarly situated public stockholders of Cempra, Inc. ("Cempra" or the "Company") against Cempra, Garheng Kong, David Zaccardelli, Michael R. Dougherty, David Gill, Dov A. Goldstein, John H. Johnson, Richard Kent, and P. Sherrill Neff, the members of Cempra's board of directors (collectively, the "Board" or "Individual Defendants," and, together with Cempra, the "Defendants") for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. 240.14a-9, and Regulation G, 17 C.F.R. § 244.100, in connection with the proposed merger between Cempra and Melinta Therapeutics, Inc. ("Melinta") through a merger transaction as alleged in detail herein ("Proposed Transaction"). Plaintiff alleges the following based upon information and belief, including the investigation of Counsel, as to all other matters.

## NATURE OF THE ACTION

1.      On August 9, 2017, Cempra announced that it had entered into an Agreement and Plan of Merger (the "Merger Agreement"), under which Castle Acquisition Corp., a wholly owned subsidiary of Cempra, will merge with and into Melinta, with Melinta surviving the merger as a wholly owned subsidiary of Cempra. Under the terms of the Merger Agreement, Melinta shareholders will be converted into the right to receive shares of Cempra's common stock in an amount equal to the exchange ratio pursuant to the Merger Agreement (the "Merger Consideration").[1] Upon completion of the Proposed Transaction, former Melinta stockholders are expected to own approximately 51.9% of post-close Cempra, while former Cempra stockholders are expected to own approximately 48.1%. In addition, post-close Cempra will be renamed "Melinta Therapeutics, Inc." and traded on the NASDAQ under the symbol "MLNT."

2.      Defendants have violated the above-referenced Sections of the Exchange Act by causing a materially incomplete and misleading Schedule 14A Definitive Proxy Statement (the "Proxy Statement") to be filed with the Securities and Exchange Commission ("SEC") on September 7, 2017. The Cempra Board recommends in the Proxy Statement that Cempra stockholders vote in favor of approving Proposed Transaction at a stockholder special meeting that will be held at an undetermined in the near future and agree to exchange their shares pursuant to the terms of the Merger Agreement based among

---

[1] Melinta shareholders who do not meet the definition of an "accredited investor" under applicable federal securities laws will instead receive a per-share cash payment based on the closing price of Cempra common stock on the closing date of the merger multiplied by the agreed upon exchange ratio.

Case 1:17-cv-00870-TDS-JEP   Document 1   Filed 09/27/17   Page 2 of 25

other things on internal and external factors examined by the Board to make its recommendation and an opinion rendered by the Company's financial advisor, Morgan Stanley & Co. LLC ("Morgan Stanley").

3. The Merger Consideration and the process by which Defendants agreed to consummate the Proposed Transaction are fundamentally unfair to Cempra's common stockholders.

4. As discussed further below, little real effort was made to engage in a true market check to find other parties interested in a strategic transaction with the Company to maximize value for Cempra stockholders. The inadequate Merger Consideration reflects the lack of effort as it does not reflect the value of the Company or the fair value of Cempra stock.

5. To ensure the success of the Proposed Transaction, the Board issued the Proxy Statement that fails to provide all material information. In particular, the Proxy Statement does not include a fair summary of the financial analyses performed by Morgan Stanley and fails to disclose the projections for Cempra (including a GAAP to Non-GAAP reconciliation mandated by the SEC).

6. For these reasons and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from consummating the Proposed Transaction or in the event the Proposed Transaction is consummated, recover damages resulting from the Individual Defendants' violations Sections 14(a) and 20(a) of the Exchange Act.

## PARTIES

7.     Plaintiffs is, and at all relevant times has been, a shareholder of Cempra.

8.     Defendant Cempra is a Delaware corporation and maintains its principal executive offices at 6320 Quadrangle Drive, Building Two, Suite 360, Chapel Hill, North Carolina 27617. The Company operates as a clinical-stage pharmaceutical company and focuses on developing antibacterials to meet critical medical needs. Cempra's common stock is listed and traded on the NASDAQ under the ticker symbol "CEMP."

9.     Individual Defendant Garheng Kong has served on the Board and as Chairman of the Board since 2008.

10.    Individual Defendant David Zaccardelli is a director of Cempra and has served as the Company's Chief Executive Officer ("CEO") since 2016.

11.    Individual Defendant Michael R. Dougherty is, and has been since 2013, a Cempra director.

12.    Individual Defendant David Gill is, and has been since 2012, a Cempra director.

13.    Individual Defendant Dov A. Goldstein is, and has been since 2008, a Cempra director.

14.    Individual Defendant John J. Johnson is, and has been since 2009, a Cempra director.

15.    Individual Defendant Richard Kent is, and has been since 2015, a Cempra director.

16.    Individual Defendant P. Sherrill Neff is, and has been since 2011, a Cempra

- 4 -

director.

17.     The parties in paragraphs 9-16 are referred to herein as the "Individual Defendants" and/or the "Board," collectively with Cempra the "Defendants."

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act.

19.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

20.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) Cempra maintains its primary place of business in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

Case 1:17-cv-00870-TDS-JEP   Document 1   Filed 09/27/17   Page 5 of 25

<u>**SUBSTANTIVE ALLEGATIONS**</u>

**I.     Company Background the Proposed Transaction**

21.     Cempra describes itself as a clinical-stage pharmaceutical company focused on developing differentiated anti-infectives for the acute care and community settings to meet critical medical needs in the treatment of infectious diseases. To date, Cempra's focus has been the development of solithromycin for the treatment of community-acquired bacterial pneumonia ("CABP"), one of the most serious infections of the respiratory tract in adults and children, as well as for ophthalmic infections and other indications.[2]

22.     On August 9, 2017, Cempra issued a press release announcing the Proposed Transaction. The press release stated, in relevant part:

> **CEMPRA AND MELINTA ANNOUNCE MERGER TO FORM LEADING, VERTICALLY INTEGRATED COMMERCIAL-STAGE ANTI-INFECTIVES COMPANY**
>
> *—Broad pipeline and resources provide multiple opportunities to drive long-term value creation—*
>
> *—Merger lays strong foundation for launch of recently FDA-approved Baxdela™ (delafloxacin)—*
>
> *—Management to host webcast and conference call today at 8:45 a.m. ET—*
>
> **CHAPEL HILL, N.C. and NEW HAVEN, Conn.– August 9, 2017–** Cempra, Inc. (Nasdaq: CEMP), a clinical-stage pharmaceutical company focused on developing differentiated anti-infectives for acute care and community settings to meet critical medical needs in the treatment of infectious diseases, and Melinta Therapeutics, a privately held company focused on discovering, developing, and commercializing novel antibiotics to treat serious bacterial infections,

---

[2] Cempra, Inc., Preliminary Proxy Statement (Form PREM14A) (September 7, 2017).

Case 1:17-cv-00870-TDS-JEP   Document 1   Filed 09/27/17   Page 6 of 25

today announced that the companies have entered into a definitive agreement under which Melinta will merge with a subsidiary of Cempra. The merger is expected to create a NASDAQ-listed company committed to discovering, developing and commercializing important anti-infective therapies for patients and physicians in areas of significant unmet need.

"The combined company's extensive pipeline, including commercial, clinical and preclinical stage anti-infective programs with multiple products in development across several indications, provides an exceptional platform to deliver potential long-term growth and value for shareholders," said David Zaccardelli, Pharm.D., acting chief executive officer of Cempra.

"We are excited to merge Melinta with Cempra, bringing together an unrivaled set of assets and opportunities," said Eugene Sun, M.D., chief executive officer of Melinta.

"This transaction creates a leading antibiotics company to drive the commercial launch of Baxdela, and build over time by developing market-leading pipeline assets meeting the tremendous need for novel antibiotics that treat serious infections," added John Temperato, president and chief operating officer of Melinta.

In June 2017, the U.S. Food and Drug Administration (FDA) approved Baxdela in adults for the treatment of acute bacterial skin and skin structure infections (ABSSSI) caused by susceptible bacteria. Baxdela is a fluoroquinolone that exhibits activity against both gram-positive and gram-negative pathogens, including MRSA (methicillin-resistant Staphylococcus aureus), and is indicated to start patients on either intravenous (IV) or oral formulations. Baxdela has been designated a Qualified Infectious Disease Product (QIDP) by the FDA and as such, qualifies for an additional five years of marketing exclusivity to be added to the five year exclusivity period provided by the Food, Drug, and Cosmetic Act. Melinta is also evaluating Baxdela in an ongoing Phase 3 study in patients with community-acquired bacterial pneumonia (CABP) and plans to initiate a clinical trial in patients with complicated urinary tract infections (cUTI). Baxdela is not currently FDA approved for the treatment of CABP or cUTI.

Beyond the commercial launch and potential label expansion of Baxdela, the combined company will continue to pursue important pipeline opportunities. Cempra is actively engaged with potential

Case 1:17-cv-00870-TDS-JEP   Document 1   Filed 09/27/17   Page 7 of 25

government and industry partners to identify non-dilutive funding to support the execution of a clinical safety study to support a response to the complete response letter (CRL) for its oral solithromycin new drug application (NDA) for CABP. Cempra also has an ongoing ophthalmic development program for solithromycin and is completing preclinical work to support a potential IND filing in 2018 with the FDA. Fusidic acid for ABSSSI continues to progress after completion of a successful Phase 3 study with a clear path to NDA submission. Radezolid, a next-generation oxazolidinone discovered by Melinta using its technology platform, is nearing Phase 1 completion in acne vulgaris, with potential for expansion to additional indications. Radezolid, which is being developed with a partner, represents the first novel antibiotic in the acne space in more than 30 years, and has potent activity against acne-causing pathogens, including resistant strains. Melinta is also actively progressing compounds within its ESKAPE pathogen program. Using a technology platform based on Nobel Prize-winning science that is licensed from Yale, Melinta has built an entirely new class of antibiotics targeting ESKAPE pathogens, the "superbugs" causing significant mortality risk to patients affected, and intends to nominate a clinical candidate from this program in 2018.

[…]

**Details of the Proposed Transaction**

On a pro forma basis, and based upon the number of shares of Cempra common stock to be issued in the merger, current Cempra shareholders will own approximately 48 percent of the combined company and current Melinta shareholders will own approximately 52 percent of the combined company. The transaction has been approved by the board of directors of both companies. The merger is expected to close in the fourth quarter of 2017, subject to the approval of the stockholders of each company as well as other customary conditions.

**Management and Organization**

The combined company, which will be named Melinta Therapeutics, will bring together a deep bench of management talent from both companies. The board of directors of the combined company will have nine seats, with four appointed by Cempra and four appointed by Melinta, together with a newly appointed CEO. Cempra and

Case 1:17-cv-00870-TDS-JEP   Document 1   Filed 09/27/17   Page 8 of 25

Melinta will work together through a joint selection committee to identify the CEO leadership of the combined company, who will be able to build on strong experience and the shared vision of the board to continue growing one of the world's leading anti-infectives companies. Melinta will designate the Chairman of the combined company board.[3]

23.     Cempra's stock has demonstrated significant growth during 2017. Cempra stockholders should be provided with sufficient financial information in the Proxy Statement to make an informed decision regarding the Proposed Transaction.



24.     Cempra's stock is poised for growth. On January 23, 2017, Zacks Equity Research, a leading investment research firm, identified Cempra as a "winning stock" that was "well positioned for a solid gain."[4]

25.     Cempra's fourth quarter 2016 results, released on February 28, 2017, were

---

[3] Cempra, Inc., Current Report (Form 8-K), at Exhibit 99.1 (Press Release Announcing Merger with Melinta Therapeutics, Inc.) (August 9, 2017).

[4] *Cempra (CEMP): An Off-the-Radar Potential Winner*, ZACKS EQUITY RESEARCH (January 23, 2017), *available at* https://www.zacks.com/stock/news/246387/cempra-cemp-an-offtheradar-potential-winner.

Case 1:17-cv-00870-TDS-JEP   Document 1   Filed 09/27/17   Page 9 of 25

very positive and illustrated the Company's growth potential. Notably, the Company reported a 36.2% increase when compared to the same time period in 2016—$7.9 million in 2016, verse $5.7 million in 2015.[5]

26.     Likewise, Cempra's first quarter 2017 results, released April 28, 2017, were positive. In fact, Cempra reported an 82% increase in revenue when compared to the same time period in 2016—$4.9 million in 2017, verse $2.7 million in 2016.

27.     The Merger Consideration offered to Cempra's public stockholders in the Proposed Transaction is unfair and inadequate because, among other things, the intrinsic value of the Company's common stock is materially in excess of the exchange ratio offered in the Proposed Transaction given the Company's prospects for future growth and earnings. The Proposed Transaction will deny Class members their right to fully share equitably in the true value of the Company.

## II.     The Materially Incomplete and Misleading Proxy

28.     On September 7, 2017, Cempra filed the Proxy with the SEC in connection with the Proposed Transaction. The Proxy Statement solicits the Company's shareholders to vote in favor of the Proposed Transaction. The Individual Defendants were obligated to carefully review the Proxy Statement before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions. However, the Proxy Statement misrepresents and/or

---

[5] *Cempra revenues up 36% in Q4*, SEEKING ALPHA (February 28, 2017), *available at* https://seekingalpha.com/news/3247158-cempra-revenues-36-percent-q4.

omits material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

29.     First, the Proxy Statement fails to provide material information concerning the Company's financial projections.   Specifically, the Proxy Statement provides projections for the non-GAAP metric EBIT, but fails to provide line item projections for the metrics used to calculate EBIT or otherwise reconcile the non-GAAP projections to GAAP. *See* Proxy Statement 93-102.

30.     When a company discloses information in a proxy statement that includes non-GAAP financial measures, the company must also disclose comparable GAAP measures and a quantitative reconciliation of forward-looking information.  17 C.F.R. § 244.100.

31.     Indeed, the SEC has recently increased its scrutiny of the use of non-GAAP financial measures in communications with shareholders. The SEC Chairwoman, Mary Jo White, recently stated that the frequent use by publicly traded companies of unique company-specific non-GAAP financial measures (as Cempra has included in the Proxy here), implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation.  Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors.  And last month, the staff issued guidance addressing a number of troublesome practices which can make non-GAAP

disclosures misleading: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data. I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures. I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[6]

32.     In recent months, the SEC has repeatedly emphasized that disclosure of non-GAAP projections can be inherently misleading, and has therefore heighted its scrutiny of the use of such projections.[7] Indeed, on May 17, 2016, the SEC's Division of Corporation Finance released new and updated Compliance and Disclosure Interpretations ("C&DIs") on the use of non-GAAP financial measures that demonstrate the SEC's tightening policy.[8] One of the new C&DIs regarding forward-looking information, such as financial projections, explicitly requires companies to provide any reconciling metrics that are available without unreasonable efforts.

33.     The above-referenced line item projections that have been omitted from the Proxy Statement are precisely the types of "reconciling metrics" that the SEC has recently

---

[6] Mary Jo White, Chair, U.S. Securities and Exchange Commission, *Maintaining High-Quality, Reliable Financial Reporting: A Shared and Weighty Responsibility* (Dec. 9, 2015), available at https://www.sec.gov/news/speech/keynote-2015-aicpa-white.html.

[7] *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/; Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. Times, Apr. 22, 2016, http://www.nytimes.com/2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0.

[8] *Non-GAAP Financial Measures, Compliance & Disclosure Interpretations*, U.S. SECURITIES AND EXCHANGE COMMISSION (May 17, 2017), https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm.

indicated should be disclosed to render non-GAAP financial projections not misleading to shareholders.

34.     The omission of the line item projections used to calculate the various non-GAAP measures included in the Proxy Statement and/or the most directly comparable GAAP measures, renders the projections included on pages 93 through 102 of the Proxy Statement materially incomplete and misleading.

35.     Indeed, financial experts agree that projections for Non-GAAP EBIT, which are included in the Proxy here, and EBITDA are not a sufficient substitute for Net Income when attempting to understand the value of a company.  As Warren Buffet and other financial experts have stated: "References to EBITDA make us shudder.  Too many investors focus on earnings before interest, taxes, depreciation and amortization.  That makes sense, only if you think capital expenditures are funded by the tooth fairy."[9]

36.     Relying solely on EBIT, which is included in the Proxy Statement here, is not a sufficient substitute for Net Income when attempting to understand the to provide a fair summary of a company's financial prospects has numerous pitfalls.  EBIT does not take into account any capital expenditures, working capital requirements, current debt payments, taxes, or other fixed costs which are critical to understanding a company's value. In fact, because the material differences between EBIT and Net Income, the SEC has explicitly required that EBIT and EBITDA both be reconciled to Net Income, because it is

---

[9]   Elizabeth   MacDonald,   *The   Ebitda   folly*,   Forbes   (March   17,   2003), http://www.forbes.com/global/2003/0317/024.html.

Case 1:17-cv-00870-TDS-JEP   Document 1   Filed 09/27/17   Page 13 of 25

the most directly comparable financial measure in accordance with GAAP.[10] Disclosing EBIT projections without GAAP reconciliation to Net Income is therefore inherently misleading.

37.     If corporate directors and officers choose to disclose financial projections in a proxy statement, they must provide complete and accurate projections, not merely excerpts of certain sets or line items of projections. The question here is not the duty to speak, but liability for not having spoken enough. With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths.

38.     The Proxy Statement also fails to provide sufficient information for shareholders to assess the valuation analyses performed by Morgan Stanley in support of its fairness opinion.

39.     With respect to Morgan Stanley's *Cempra Discounted Cash Flow Analysis* and *Melinta's Discounted Cash Flow Analysis*, the Proxy Statement fails to disclose the inputs and assumptions underlying the discount ranges used in Morgan Stanley's analyses to calculate the weighted average cost of capital. The omission of this material financial information renders the summary of Morgan Stanley's Cemp *Cempra Discounted Cash Flow Analysis* and *Melinta's Discounted Cash Flow Analysis* on pages 85 through 86 of the Proxy Statement and the Implied Value Per Share Range set forth therein incomplete and misleading.

---

[10] *See* C&DI Question 103.02.

40.     Indeed, as a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006). Such choices include "the appropriate discount rate, and the terminal value…" *Id*. As Professor Davidoff explains:

> **There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars**….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques. **This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion <u>unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices</u>**. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions. *Id.* at 1577-78.

41.     Similarly, the Proxy Statement fails to disclose the Net Operating Losses ("NOLs") for Cempra and Melinta. *See* Proxy Statement 85-86. Here, the existing NOLs are not being included in the standalone *Discounted Cash Flow Analysis* and *Melinta's Discounted Cash Flow Analysis*, but this information is material since it exists and, therefore, should be disclosed to Cempra shareholders. As Professor Davidoff discussed above, the rationale to exclude certain inputs—Cempra's and Melinta's NOLs—from the

DCF analyses is equally as important as the decision to include the same inputs and, in its absence, omits material information. Accordingly, the omission of this material information renders the summary of Morgan Stanley's DCF analyses on pages 85 through 86 of the Proxy Statement and implied equity value set forth therein materially incomplete and misleading.

42. Lastly, with respect to the *Equity Research Analyst Price Targets* section, the Proxy Statement notes that seven equity research analysts set price targets for undiscounted price targets for shares of Cempra common stock between $2.00 and $9.00. Proxy Statement 89. However, the Proxy Statement fails to disclose the identities and the individual price targets comprising the range. The absence of this information forces shareholders to blindly rely on the seven equity analysts referenced simply because they were published on Bloomberg. Moreover, merely providing shareholders with the high and low price targets only illustrates the scope of the range without giving any indication of an "average price" among these seven, unknown analysts and the potential concentration of target pricing among these individuals. As a result, the omission of this information renders the vague reference to the equity analysts price targets on page 89 of the Proxy Statement materially incomplete and misleading.

43. In sum, the omission of the above-referenced information renders statements in the Proxy Statement materially incomplete and misleading in contravention of the Exchange Act. Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Transaction, Plaintiff and the other members of the Class will be unable to make a fully-informed decision regarding whether to vote in

favor of the Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

**CLASS ACTION ALLEGATIONS**

44.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of Cempra (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

45.     This action is properly maintainable as a class action because the Class is so numerous that joinder of all members is impracticable. As of August 2, 2017, there were approximately 52.51 million shares of Cempra common stock outstanding, held by hundreds to thousands of individuals and entities scattered throughout the country. The actual number of public shareholders of Cempra will be ascertained through discovery.

46.     There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

     a.  whether Defendants have misrepresented or omitted material information concerning the Proposed Transaction in the Proxy Statement in violation of Section 14(a) of the Exchange Act;

     b.  whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

     c.  whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Merger based on the

- 17 -

materially incomplete and misleading Proxy.

47.     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Class.

48.     Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class.

49.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class.

50.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

51.     A class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude maintenance as a class action.

## COUNT I

### (Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 and 17 C.F.R. § 244.100 Promulgated Thereunder)

52.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

53.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by

- 18 -

the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

54. Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

55. SEC Regulation G has two requirements: (1) a general disclosure requirement; and (2) a reconciliation requirement. The general disclosure requirement prohibits "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that measure, contains an untrue statement of a material fact or *omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure...not misleading.*" 17 C.F.R. § 244.100(b). The reconciliation requirement requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure, and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most directly comparable" GAAP measure. 17 C.F.R. § 244.100(a). As set forth above, the

Case 1:17-cv-00870-TDS-JEP   Document 1   Filed 09/27/17   Page 19 of 25

Proxy Statement omits information required by SEC Regulation G, 17 C.F.R. § 244.100.

56. The omission of information from a proxy statement will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

57. Defendants have issued the Proxy Statement with the intention of soliciting shareholder support for the Proposed Transaction. Each of the Defendants reviewed and authorized the dissemination of the Proxy Statement, which fails to provide critical information regarding, amongst other things: (i) the background to the Proposed Transaction; (ii) financial projections for the Company; and (iii) the valuation analyses performed by the Company's financial advisor.

58. In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy Statement, but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

59. The Individual Defendants knew or were negligent in not knowing that the Proxy Statement is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision

to approve and recommend the Proposed Transaction; indeed, the Proxy Statement states that Morgan Stanley reviewed and discussed their financial analyses with the Board, and further states that the Board considered both the financial analyses provided by Morgan Stanley as well as its fairness opinion and the assumptions made and matters considered in connection therewith. Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and the details surrounding the process leading up to the signing of the Merger Agreement. The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy Statement, rendering the sections of the Proxy Statement identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to review Morgan Stanley's analyses in connection with their receipt of the fairness opinions, question Morgan Stanley as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy Statement and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

60. The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy Statement. The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The Individual Defendants were negligent in choosing to omit material information from the Proxy Statement or failing to notice the material omissions in the Proxy Statement upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the

Company's financial projections.

61.     Cempra is also deemed negligent as a result of the Individual Defendants'
negligence in preparing and reviewing the Proxy Statement.

62.     The misrepresentations and omissions in the Proxy Statement are material to
Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such
misrepresentations and omissions are not corrected prior to the vote on the Proposed
Transaction.  Plaintiff and the Class have no adequate remedy at law.  Only through the
exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from
the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange
Act)**

63.     Plaintiff incorporates each and every allegation set forth above as if fully set
forth herein.

64.     The Individual Defendants acted as controlling persons of Cempra within the
meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their
positions as officers and/or directors of Cempra, and participation in and/or awareness of
the Company's operations and/or intimate knowledge of the incomplete and misleading
statements contained in the Proxy Statement filed with the SEC, they had the power to
influence and control and did influence and control, directly or indirectly, the decision
making of the Company, including the content and dissemination of the various statements
that Plaintiff contends are materially incomplete and misleading.

65.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

66.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Proxy Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in preparing this document.

67.     In addition, as the Proxy Statement sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing and approving the Merger Agreement. The Proxy Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

68.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

69.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as

- 23 -

controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

70. Plaintiff and the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B. Enjoining Defendants and all persons acting in concert with them from proceeding with the shareholder vote on the Proposed Transaction or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy Statement;

C. Directing the Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing;

D. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses;

E. Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

DATED: September 27, 2017

Respectfully submitted,

**WARD BLACK LAW**

By: /s/Janet Ward Black
Janet Ward Black
NC Bar No. 12869
Nancy Meyers
NC Bar No. 23339
208 West Wendover Avenue
Greensboro, NC 27401
Tel.: (336) 510-2014
Fax: (336) 510-2181
jwblack@wardblacklaw.com

**OF COUNSEL**

**MONTEVERDE & ASSOCIATES PC**
Juan E. Monteverde
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel.: (212) 971-1341
Fax: (212) 202-7880
Email: jmonteverde@monteverdelaw.com

*Counsel for Plaintiff*

*Counsel for Plaintiff*

- 25 -